Welcome, ladies and gentlemen. We have three argued cases today, ORACLE AMERICA v. GOOGLE INC., Metcalf Construction v. U.S., and In re. Packard, one from the District Court, one from the Court of Federal Claims, and one from the Patent and Trademark Office. The first case we will hear is ORACLE v. GOOGLE, case number 13-1021. Counsel, as you know, we've decided to divide the argument on the appeal from the argument on the cross-appeal, and I understand that with respect to the appeal, you want to reserve five minutes for your rebuttal. Is that correct? Yes, Your Honor. Thank you. Okay. Ready? Okay. You may begin. Thank you, Your Honor. Good morning. May it please the Court. My name is Josh Rosenkranz, and I represent ORACLE. Your Honor, it's in this copyright case where extraordinary creativity is conceded, the central question is whether the Creative Computer Code loses all copyright protection under Section 102B just because it also serves a function. I'd like to spend most of the... Can you just fill me in on some elementary background? What Google product contains the outline of declarations that's at issue here? To whom does that go? What is the activity that constitutes which of the 106 infringements? So the product is Android, Your Honor, and it goes into every smartphone, it goes into a wide variety of products that are... Every idea of Android contains this 7,000-line outline of declarations. The 7,000 lines and the structure and organization of 37 packages of software. So where does it go? It goes into these products, and the 106 activity is the copying of the... Does it go anywhere else? Does it go anywhere else? To app writers. Or do app writers have their own version of this outline of declarations downloaded from the Oracle website? So app writers, those who write for Android, download this code from Android. Those who write for Java, download from the Java platform. For those who are writing for Android, do they need to download it from Google, or can they just use the copy that they can get from Oracle, if it's the same set of declarations? Well, so one of the key factual points in this case is that if you are writing for Java, you have to use the Java platform, that is, if you're writing apps for Java. If you're writing apps for Android, you have to use Android. There is not a single app that will run on Java, that was written for Java, that will run also on Android. So there's actually no interoperability at all. So if you're a Java programmer, you go to... No, I mean, I'm really at almost non-legal questions about how this works. When you get... If you're a handset user and you have the handset, you are not personally understanding any of the expression and then using it. So put that aside for a minute. On the app writer side, does the app writer get or have to get something from Google that contains the expression that you assert as protected and use it to do something? Or can he use his own copy of that from his Java world? Well, so here's the way it works for the developer. The developer goes to the... In this case, we're talking about Android, so the Android website. The Android website has all of the declaring code. And the way they typically do it is they copy the declaring code into their programs. The programs then interoperate with Android. In other words, when you write java.lang.mat.mat, to use the example that's recurrent throughout the district court's opinion, it then invokes the program within Android. And so it's interacting with Android. And the same for Java, but the developer goes to the Java website. The developer who writes for one cannot operate his program on the other. It simply is not interoperable. But then to step back on the... Before you step back, let me just get one further factual piece of information. You pointed out that there's no interoperability, if that's the right word, between Android and Java. That, however, is because of the way you... Is because of the way Google developed the lower parts of the hierarchical order in their own terms. In terms of the declaring code, there is similarity, if not identity. Isn't that correct? Let me answer the second half first. There is identicality as to the 37 packages with respect to the declaring code. But the reason it's not interoperable, Your Honor, is not that the so-called implementing... The reason is they wanted Java developers to be able to easily use the Android system. Isn't that right? The answer is that Google did want Java users to easily transition over to Android. And so they took the most important, the most memorable, the most appealing pieces of the declaring code and incorporated that. But that, Your Honor, is not why it's not interoperable. The reason it's not interoperable is because Google purposely developed a platform that destroys the right ones to run anywhere. It purposely developed a program so that an app that is written for Android simply will not run on Java and vice versa. Let me get you back into the legal argument there. All right. So you can go back to where you wanted to go, but take me here first. You tell us what a method of operation is not. Can you... But you don't really define what a method of operation is. How do you define method of operation then under 102B? Well, Your Honor, method of operation came from Baker versus Selden. That exact phrase was used in that case. A method of operation is to use one of the examples Baker used. If you write a book and the book is about how to design a set of drugs and then use them in the human body to cure a disease, that expression is protected. The protection of copyright does not extend, in the words of section 102B, to the method of operation. It doesn't extend to the surgery. Not that far. But what do you define as a method of operation? A series of steps that can be stated in an abstract way. Okay. So is there a distinction in the packages? You have 37 packages, but three of those are more basic than the others, correct? The district court differentiated between the java.lang, java.utility, I guess. Yes. java.io. Are those... Should we view those differently? These would be the concept of a method of operation than the other packages? I think not, Your Honor. I would view them differently with respect to fair use. And so let me just circle back to the question. It's not that they're more basic. It's that there are just several methods, that is, routines, within just those three packages that are necessary in order to, quote, unquote, speak the java language. Nothing in the other 34 packages is necessary in order to speak in java, so to speak. If you think that's a fair use issue as opposed to a method of operation issue. Yes, Your Honor. I think it might go to merger. It might go to the question whether someone, since we've conceded that it's okay to use the language, okay, if it's all right to use the language, are there certain things  arguably, although I still think it's really a fair use analysis. But Your Honor brought me right to where I wanted to go with respect to the central question in this case, which is, or I would say the central rule of decision, which is that computer code, just like any other literary work, is protectable, it's copyrightable, so long as the author had other means of communication, other ways of expressing the same idea. And the district court found this particular declaring code to be unprotectable, which is to say that it had zero copyright protection. And can I just, just so I understand, that principle is one that putting the facts, specific facts aside, is inconsistent with both of the opinions in Lotus against Borlaug, right? That is, put aside whether the particular commands in Lotus 1, 2, 3, were so simple as essentially to merge into a function, you couldn't call them anything else, and maybe even the relation of them, the Judge Stahl's opinion and Judge Boudin's opinion, at least the half of it that's not fair use, say we don't actually agree with that principle. I would say that is, yes, the answer is that is correct. There is a way to get to the result in Lotus, but there's a lot wrong with the analysis of Lotus, the most fundamental of it being, yes, Your Honor, it is flatly inconsistent with the rule of decision that this court applied in Atari, applying Ninth Circuit law, and that the Ninth Circuit applies, say, in Johnson Controls or in Apple versus Microsoft. You were saying, and I'd like to hear the end of that paragraph, pick up where you were, you were saying that this was the central issue. Yes, Your Honor, and I was saying that the district court's conclusion that this declaring code gets zero protection would be wrong as to any code that meets the minimal level of creativity, but especially as to this code. These Java packages would not have been the runaway success that they became if the declaring code had not been written and organized in a way that was intuitive, coherent, easy to express it. Is the Java language a literary novel? No, of course it isn't, but when Congress chose to treat computer programs as literary works, it invoked this whole body of precedent and the whole body of principles that govern literary works. I read the district court as having some problem with separating out expression from function. And that is, most literary works, I don't want to generalize, typically a literary work is not something that can be called functional. But it seems to me that almost all computer code has to have a functional purpose. Otherwise, what's the point of putting it into the code? You don't write computer code just to have some sort of pretty expressive phrasing. You write it because it has a function. Do I understand that correctly? So that, isn't it sort of difficult to try to find computer code that doesn't have some functionality to it? That is correct, Your Honor. It is impossible, I would say, to find computer code that doesn't perform a function. That's one of the key problems with the district court's opinion. All computer code is a series of commands that ends up with a particular set of results. If that's true, then how do we separate out the expressive quality? Surely the functional quality is not copyrighted, but the expressive quality, assuming it has one, is copyrighted. Presumably. How do we separate one from the other when it's all built into the same language? So let me first, by way of leading into the answer, just challenge the premise that was embedded in your earlier question, Your Honor, which is that most literary works are aesthetically pleasing but have no function. There are a lot of literary works that have functional elements. Well, you could say their function is to make money for the office. No, no, no, I do mean it that way. I'm not talking about novels. I'm talking about encyclopedias. I'm talking about instruction manuals. I'm talking about medical and dental taxonomies. They all are deeply functional. Phone books. Phone books. And at least yellow pages that have a particular function and that are expressive in the way that Feist describes and that Baker v. Selden describes. And so just because something has a function does not mean that the expression loses copyright protection. I understand that. But how do we separate those two? How do we tell when one's predominant over the other when we're dealing with computer code? Let me give you an example. And I just want to, before I answer, just want to note that I do want to get to fair use at some point. We're used up all your rebuttal already, but that's partially because we have taken you way down a lot of other roads. So we're going to give you some more time. We'll give you more time as well. Actually, we're a minute away from my rebuttal, from getting into my rebuttal. But let me answer the question. If the court looks at page 25 of our brief, you get the perfect illustration of the difference between function slash idea or method of operation slash idea on the one hand and expression on the other hand. So page 25 is a graphic illustration of 4,000 lines of code. They are lines of code that describe, that implement a function of organizing the security functions of an operating system. What Oracle cannot do is say, we came up with the idea of organizing security functions of a computer. And therefore, no one, not Microsoft, not Apple, can create an operating system that organizes the functions of a computer that relates to security. What Oracle can do is to copyright this specific selection of 362 methods and the manner in which they are organized and arranged. But let me ask you something in between. What about just the concept? Would you say that you could prevent someone without a license from using the package class method structure in the abstract? No, no, not at all. That is the concept of organizing methods into packages or methods into classes. But not all programming uses that formula. And we would never claim that anyone who uses a package class method manner of classifying violates our copyright. We don't own every conceivable way of organizing. We own only our specific expression, our specific way of naming each of these 362 methods, putting them into 36 classes and 20 subclasses. So you're not arguing for copyrightability of your SSO, is that right? No, we are, Your Honor. We are arguing for copyrightability of this. I thought your answer to Judge O'Malley was that you couldn't copyright the system and structure. So let me make sure that... At the biggest abstract level. Yes. What we can't do is say to, let's say, Microsoft, thou shalt not ever write a program that organizes security functions by putting them in any class and any method by any selection. But what we can do is copyright our decision to choose 362 specific routines and to put them in the specific organization that we did with the interrelationships among these various packages and within packages among the various classes. That's our expression. The idea is the concept of organizing. There are also lots of methods. Can I ask you a question? This might not be an intelligent question, but is there something about the relation of the underlying methods, not the expression of the underlying methods, that has an internal organization mirrored in this expression? I'm sure it's an intelligent question, Your Honor. I'm not sure I understand it, but let me answer it this way. It's so intelligent, we don't understand it. I think he's got it over my head. I think I do understand. You talked about relations and methods. Now, methods is on the 102B side. Maybe methods can be related, in which case you can't copyright the relations of the methods. You can copyright the relations of your expression that may point to or represent the method. Your Honor, I think there's a terminological problem. When I used the word method in describing these 362 methods, I was actually using the, that is the name for subroutines. But each method has its own specific name. And so to answer your question, there are two ways to answer it. One is, yes, these are organized in particular ways that Oracle slash Sun came up with as its own unique organization. So even if any particular name has no copyright protection, Feist tells us that the unique and original organization does. The second answer is, it just so happens in the context of this case, the way that Google stole, plagiarized these 362 methods or the structure, sequence, and organization within the 37 packages was to copy the code because the structure actually turns out to adhere in the code. And one of the things- Which is why this debate about whether you can separate this declaring language from the SSO itself is, in your view, not an appropriate debate because they are essentially one and the same. Yeah, Your Honor, yes. I mean, that whole waiver question is a sideshow. I mean, they copied the structure, sequence, and organization, and all of the interrelationships by copying the code. But it was also clearly in the case, the district court thought the literal, the copying of literal elements within the case, which is why the district court wrote an opinion that covered things like merger and short phrases that has no relevance at all to anything unless that is in the case, the copying of literal elements. Before we get to fair use, I just have one question. That is where the district court said, if this all has to come back, then I have to go in and separate out piece by piece things that are protectable from things that are not protectable. Do you agree that that exercise has to occur? No, Your Honor. I mean, the answer is no. Every single package has its own structure of classes and then the subroutines, the methods within the class. One can look at that proposition and say, oh, come on. There is organization. There is creativity in the organization in every package. That is enough to satisfy the 102A, 102B relationship. It just struck me that I never answered the question that Judge O'Malley was asking right at the outset about how 102A and 102B relate. And so before I get to fair use, I just want to make this one textual point. And that is 102A covers the expression. That's what's copyrightable. 102B is not a set of exclusions. 102B defines the scope of the copyright. So 102A says we own the copyright on the expression. What does it then extend to? It extends to only the expression, not to the bigger ideas, not to the bigger method of operation. It's not an extraction of coverage. It's a limitation on the extent to which the expression gains you something beyond that. Okay, so if there are no further questions. It's because you really don't have a lot of time. Yes, Your Honor. So let me just... Well, you don't have any time left, but we're giving it to you anyway. Thank you. I would urge the court not just to reverse on copyrightability, but also to reach fair use. And I'll just say three very quick things related to... To reverse on copyrightability, but in addition, to address whether fair use can be decided as a matter of law. You agree, though, that fair use is predicated on underlying factual questions. The ultimate conclusion. Often, yes. In this case, it's predicated under... It's predicated on underlying facts that are not at all in dispute. This court can reach fair use and find that the use was not fair as a matter of law, as the Supreme Court did in Harper and Rowe, and as the Ninth Circuit has done repeatedly, most notably in Monge and Worldwide Church. All right, straighten something out for me. I confess right up front that I am not an expert in copyright law. We don't deal with it quite that often. So help me understand. I would have thought fair use was a relevant issue on infringement. Is that the right word? You do use infringement in copyright law. We do, yes. I would have thought fair use relates to the question of whether a particular use infringed an existing copyright, because fair use is sort of an exception to the copyright coverage, rather than an issue that goes to the question of copyrightability. As I read the trial judge's opinion, I'm confused about how he viewed fair use, because it seems to me he was merging it with the question of copyrightability. So let's, right at the outset, have an understanding of your understanding. Is that a significant confusion, or is it just my confusion? Well, Your Honor, you have identified very succinctly the district court's confusion. When the district court and when Google invoke, for example, principles from Sega and Sony, they are talking about principles that are taken from a fair use discussion. Fair use comes after copyrightability. It comes after infringement. It is an affirmative defense to a claim of infringement. The use of a copyright, of a legally copyrighted material. Correct. Fair use is an affirmative defense to that. Yes, Your Honor. And just to get a technical... That was a question. Yes, you know, I agree. And to get technical, the way the statute works, we always call it an affirmative defense that comes after copyrightability. Okay, so it's copyrightable. Then has it been copied? If so, you end up with infringement, and then you talk about fair use as a defense. Was the use okay, even though it's an act of infringement? The technicality is the statute actually defines fair use as not infringement, even though everyone views it as an affirmative defense. But I don't think that needs to detain the court. I think the important... Now, assuming we agree with you that the District Court imported fair use principles into the upfront portion of the analysis, which was wrong. You still agree that all of those factors are relevant to fair use. So when we get to fair use, why wouldn't it be appropriate for us to say all of those factors that the court found to be meaningful should be reweighed, but reweighed only in the context of fair use? Why shouldn't we send that back to the District Court for that purpose? Well, Your Honor, that's certainly a possibility. I would urge the court not to do that. And the reason is the court has a full record that is the record of this trial. If we go back to a fair use trial, all we'll be doing is recreating that fair use record and presenting it to this court again. Secondly, there are some fundamental... Excuse me. Your view is if we find your scheme was copyrightable, we can use the record on fair use to determine as a matter of law whether... Is that normally a jury question? It is often a jury question. In the briefs in this case alone, there are a good 15 cases. That decides fair use as a matter of law. It is very common, and particularly where the use is so patently unfair. Just so I understand, is that as a matter of law in the way in which Rule 50 talks about deciding factual questions as a matter of law, or is it more like as a matter of law, like obviousness in our patent law where there are underlying facts, but ultimately the determination of what to make of the facts is actually a legal question subjected to no... Your Honor, it's a JMAL standard. That is what... So the fair use question, one would say, is a fact question. The fair use question, it can be a fact question. No, no, no, no, it can be. Yes, yes, yes, yes, yes. I'll... Yes, the fair use... So it's a standard... All questions can be decided ultimately as a matter of law in the right circumstances. Correct. Is that what we're talking about here?  What we're talking about is undisputed facts leading to a conclusion, just as the Supreme Court did in Harper and Rowe, that the use simply cannot be fair. And I say that for a couple of reasons. I'll just... I'll give the headlines very quickly. First, there's no dispute that Google took this code for its own commercial purposes, and it did that to leverage Oracle's fan base. Secondly, there is nothing transformative about this use. The Android code that was taken is used in Android for exactly the same purpose for which it is used in Java. I think we have all of that in the brief. Do you want to just wrap up because we're way over? Yes, right. I'll just say one last thing, and that is that the market harm is also extraordinary. If you just look at the picture pre-Android and post-Android, pre-Android, Oracle was the dominant force in operating systems and particularly in mobile phones, mobile devices. And after that, Android took over and completely supplanted Oracle's Java.  Thank you, Your Honor. Thank you. We'll give you five minutes of rebuttal back. We'll add 13 minutes onto the Google argument if it's necessary. Don't use it if you don't want it. Of course not, Your Honor. Good morning. May it please the court. I'm Bob Van Nest, appearing here for Google and with me at counsel table are Michael Kwon and Steve Hirsch. Obviously, as the court appreciates, this case concerns the command structure of a computer program, not a novel or a piece of literature. And in the Ninth Circuit, which law controls here, those functional elements of a computer program that are necessary for compatibility are not copyrightable even if they're created. Can you just help me? And I guess I ask this to apply throughout your argument. Every time you say compatibility or interoperability, can you say what the two things are? Because compatibility, it has to be a pair of things. It's a couple of things, Your Honor. It's two things. And by the way, this issue of copyrightability was given by both parties to the district court in a bench trial. So Judge Alsop heard two weeks of testimony, 26 witnesses about Java and Android and how they were created, what they are, and how you separate, as Judge Plager asked, how you try to separate the creative expression, which might be copyrightable, from the non-copyrightable method of operation. That's why we're giving you an extra 13 minutes. There we go. Perfect, perfect. But under your argument, if I take it to its ultimate logical extreme, does that mean you could have copied the entirety? No, absolutely not. Absolutely not. Let me answer Judge Toronto's question and then get right to that. The two elements of compatibility that the district judge found based on the facts were, one, that if you were writing within these 37 programs, that these 37 APIs, they were interoperable in that you had to use the same names, phrases, and structure to call those functions up. I'm sorry. X is interoperable with Y. What are X and Y, please? A program written in the Java language can run on Android if it's only using packages within the 37. So if I'm a developer, and I've written a program, I've written it in Java, I can stick an Android header on it, and it'll run in Android because it's using the identical names of the classes, methods, and packages. And the district court found that there was code out there that had been written. Both experts conceded that if you're operating within these 37 packages, the code is interoperable. Java programs can run on Android. And the other thing that the district court found on compatibility was, not only are those programs interoperable, but Java's owner, Sun, had given away this tool, had given away the SSO to developers to use. That's not relevant to copywritability. I mean, you've... It is, Your Honor, in this respect. People give away books all the time. That doesn't mean there's no copyright. But the district court specifically made a finding that the very functionality that you wanted to accomplish could have been done through different language, correct? He did. He did. That's correct. And so you're saying that he found that it was necessary to use this precise language, but I think he found just the opposite, as a matter of fact. No, he did two things. He found that developers out there in the community that were writing in Java, the Java free language, they had developed an expectation that these functions would be called when you use these words. And that expectation is the expectation they have in using the SSO, which had been out there and promoted by Sun to be free for everybody to use. Now, it's not our position that none of Java is copyrightable. Obviously, Google spent two and a half years, dozens of engineers, and millions of dollars, as the trial court found, to write from scratch all of the implementing code in the Java libraries. All of the Android implementing code, 15 million lines of it, is original. And we're not claiming here that that's not copyrightable. Of course, to the extent that Java has been made available even to the general public, it's always pursuant to a specific license, correct? Java itself, yes, but the SSO, the names, the phrases, the declarations, there were at least two other programs, the Apache program, the GNU class path program, that had used for years all of these same names, declarations, and packages without any complaint from Sun. No license, no nothing. Apache, GNU, out there, same SSO. And this is what the district court said. He looked at how Java operates, and he separated out, just as the Atari case from this court says you must, he found it was creative, but he then said, under 102B, I have to separate out those things that are systems or methods of operation. And just like in SEGA and Sony, he found that if... Well, SEGA and Sony, I mean, in fairness, everything you quote from SEGA and Sony is in the fair use analysis. It is, but it's... Not any of it is under copyrighted, though. It is, though, Your Honor, for this reason. What both SEGA and Sony hold is it was fair to copy the entire program of SEGA Genesis or the Sony PlayStation in order to use the interfaces that... Right, so under SEGA and Sony, could you not have deconstructed what the Java program was and then gone in and written your own declaring code? No. You could have done that. But it wouldn't have been compatible, wouldn't have been interoperable. What Sony and SEGA say... It wouldn't have been easy for other Java users to do it, but that doesn't mean that it wouldn't have had the same exact function. As the court found, you could have rewritten the whole thing, but what he found was under SEGA, Sony, and Lotus, there was no requirement to, because if 102B has any meaning, 102B says if it's a method or a system of... A method of operation, the thing that runs the program rather than the program itself or the tool that accesses the program rather than the program itself, that is not copyrightable. That is a method of operation, a system, and what the court... That means that Apple and Microsoft, for instance, you could take all of their declaring codes. If they had a program like Java, where... What do you mean a program like Java? They've got a program. They've got a program. You say programming that has declaring codes that you would have to use to write just like that program is not copyrightable. This isn't a question of whether it's like Java or not. You could have taken Microsoft or Apple by deconstructing it and then using it under your theory, right? Yes, but only the structure, sequence, and organization, only the command structure, what you need to access the functions. You'd have to rewrite all the millions of lines of code in Apple or in Microsoft, which is what Google did in Android. They rewrote from scratch all of the implementing code and the line, to answer Judge Flager's question, the line that the district court drew was, if we're talking about implementing the function, the actual... The heavy lifting, as he called it, the work of performing these tasks, that you can't copy 15 million lines of Android code were all original. If we're talking about the means to access those functions or the means to operate the program, the so-called structure, sequence, and organization, that is just like it was in Baker and Selden and in Sony and in Sega and in Lotus. That is a method of operation. It's a system that he found after two weeks of trial. This would apply to every possible computer program out there, correct? If they run using a structure, sequence, and organization, yes, because in the Ninth Circuit, what is... How many computer programs don't run with SSO? I'm not sure, Your Honor, but there has to be some means of accessing the program. Here, the court found, after, again, the trial testimony, that developers out there were interoperable. To be interoperable, you had to use those words, and that Google was very careful to use only those elements that were part of the structure, sequence, and organization, and not use any of the implementing code, and that was a critical distinction. Can I ask you a question? Are you acknowledging that your argument does actually rely on a shift in time? That is, suppose, as did not occur, Sun created and announced to the public for the first time all 37 packages at the same time, and there was not a developer in sight yet who had written anything. At that point, is this declaring code a method of operation? I think so, Your Honor. But that can't have anything to do with interoperability of any X to Y. But under Baker v. Selden... Okay, so I guess I'm trying to understand. Are you making two quite distinct arguments? I think the district court used two distinct bases to support its opinion. So how could that possibly be a method of operation if, as the district court found, at the time, the day Sun announces its 37 packages, there were effectively infinite numbers of ways in which it could have written that expression? It's the same thing that Baker and Selden said, which is this. If you have, let's say, an accounting program, a way to do accounting, you can copyright your book describing it, but you can't copyright the system. You have to patent the system. And what the court found was, and this is echoed in Sagan-Soni, is that if you have a method of operation for accessing a program, that is potentially patentable. You may get a patent on that. It's a system of operation. It's an organizational structure that is used to operate something. It's closer to an idea than an expression, and they didn't patent it. Right, but going back to the hypothetical of Sun announces the 37 packages, and they involve 7,000 functions, things that the computer will do with inputs to produce outputs. Assume none of that. That's not what is being claimed as patentable. It is, rather, the set of expressions that name all these things and make connections between the names so that users would have a particular experience with it. I don't see why a set of expressions is on the method of operation side of the law. Because these names, they're more than just a set of expressions. That's the point that Judge Alsop came to after the testimony. They are the way the program operates. They're the command structure. But why is that not true of every instruction line in the program? It's because in the Ninth Circuit, following 102B, following Baker v. Selden, that type of structure is closer to an idea or a system or a method of operating a program than the forms, the functions of the program. And you're quite right that at the beginning, at the beginning, you don't have a question of compatibility, because let's say there's nobody out there. But at the beginning, you still have to do what Atari did and what the courts in, say, Gascony and Lotus did, which is evaluate under 102 what aspects of this claimed copyrightable expression have to be filtered out. And that was the long process that Judge Alsop went through. And the line that he drew was, if it's needed to operate the program, to access the program, if it's a tool for commanding the program and calling it up, that is a method of operation or a system that's closer to merger, that you may go out and patent. And let's remember, this case started as a patent case. It was never a copyright case at the start. You can patent that, but you can't copyright it. What you can copyright is all of the creative expression that performs the functions in those class libraries. And that clarifies something for me that you said earlier that has left me a little puzzled. The 37 packages at issue in this case, you all copied the declaring code for those 37 packages from Java, but you wrote your own implementing code. That's correct. That's correct. Then earlier you said that those 37 packages could be used in a Java program, or maybe it's the other way around. The original Java program, which used those same declaring codes, but had its own implementing code different from the Android code, could be used in Android units. I don't understand how that would work. Is the implementing code not relevant to the question of compatibility or interoperability? It's not really, Your Honor, because there may be a lot of different ways to perform the actual function. And all the developer does is he writes java.math.max, or android.math.max, and the program, the language itself, does the work. So it doesn't matter to the programmer whether he's on Java or in Android, the functions are being provided by the language itself. He gets a different implementing code. He does. I mean, a different implementing code is used in Android. So the only thing that's interoperable or comparable are the declaring codes. That's right. That's right. That's exactly right. And those are the things... I misunderstood your point. No, that's exactly... Just to bring it back a little bit. You can see that there are any number of ways to write language that would accomplish the exact same function, correct? The court found that Google could have written a whole new set of SSO, but wasn't required to because the SSO was not copyrightable. That's right. He found that... Yeah, so let's go back. I just mean, I understand what he also found later, but specifically he found that this was creative. He did. In fact, he found it not just minimally creative, he found it to be very creative, right? Creativity was never contested. We never contested that. And he found that there were any number of ways to accomplish the exact same functionality with different words. Isn't that right? He did. Okay. So we have those factual findings, right? And you're saying that those factual findings do not convey copyrightability. That's right. Because what Judge Elsop found following Sega and Sony was if what you have... Let's remember, Sega Genesis didn't exist at the beginning of time. It was written by Sega. Sony PlayStation didn't exist at the beginning. And those... Anywhere in Sega or Sony, any of the discussion that you're talking about occurs other than in the sections where they're discussing fair use. It happened... You're right, Your Honor. It happens in those sections, but the whole predicate is you can copy the whole thing because you can use the interface functionality. It's not copyrightable. It's not protectable. Why shouldn't all of this discussion be relegated to the fair use question instead of to the copyrightability question? And related to that, do you agree that fair use is an infringement question, not a copyrightability question? I do. I do. Fair use is part of infringement, and it's a jury question, and it's a fact question. And I will talk briefly about fair use. So let's just try to be fair and free. And answer Judge Elsop's jury question. I'm sorry. I put it in the middle, so I get it. I lost it. I lost it. I lost it, Your Honor. Your question was... So why shouldn't we relegate those discussions? I'm not saying they're not relevant factors, but why shouldn't they be considered in the context of fair use rather than crammed into the copyright... Because 102B is not a fair use issue. The basic structure of the copyright statute is you have A and B, and they're proceeding as though B doesn't even exist. They're saying if it's creative under A, boom, you're home. That's not the law. Because what Atari... I don't think that's what they're saying at all. No, they're just saying that the method of operation should be looked at at a more abstract level. Okay. But then when would any method fall outside copyrightability, right? And so what happened in Sega and Sony and in Lotus and in Atari was the trial judge was expected, after making a finding of creativity, that's just a basic threshold, to, quote, filter out... This is what Judge Rader said, filter out the non-protectable elements and filter those out under B. That happens before you even get to infringement. In Atari, we found that, in fact, the exact kinds of things that you're talking about don't filter out. In Atari, the facts were different and the trial court made a different determination and that determination was reviewed here for abuse of discretion, but there... And in Sega and Sony, the Ninth Circuit said they don't filter out under 102B. No, no. In Sega and Sony, the court basically said these functional elements that you need to either control a program or get through the security of a program... I'm just putting a square peg into a round hole on Sega and Sony, so I'm not going with you on that one. Okay. Understand that Lotus is probably your strongest case and in some ways might be the only case that really holds on all fours for what you want. The principles of Sega and Sony apply here, but the facts of Lotus are closer. You're quite right, Your Honor. And the legal analysis in Lotus is the only one that is the same one that you want us to adopt. Come on, Sega and Sony do not say what you're saying they say. Yes, they're strong on your fair use argument, but they don't say that. They say, though, that these functional interface requirements are not protectable. That's my point. And they cite 102B. I quite agree. There's not a lot of discussion, but they cite 102B and they say these interface procedures... Right, right. But let's go to Lotus. In Lotus, 569 separate commands in 50 menus were used by Borland and the analysis was exactly the same as Judge Yeltsin applied here. And they said there, it is okay for Borland to use those 456 separate commands and in 50 separate menus to make a competing product that works the same way because it was an expectation in the marketplace that those would be available and it was perfectly acceptable to do that. Right. On the other side, in Borland, the district court actually made a finding that the what was taken in Lotus was so basic that it wasn't creative. Do you agree with that? I... The Court of Appeals. The Court of Appeals. District Court ruled for Lotus, right? Yeah, the Court of Appeals ruled for Borland and the Supreme Court left it alone, four to four, as we all know. But the finding in Lotus was that it's a command structure, perhaps more basic than Java, although I'm not sure that's true, but it's a command structure and the command structure was not protectable under 102B and it was perfectly fair game for Borland to go out and use the entirety of that command structure to build a competing product that worked in the same way. And it relied on expectations, industry standards, and what... They make a creativity finding. That's what I'm trying to find out. I think it's fair to say in Borland the system was less developed than one would say in Java. But they still do a 102B analysis regardless of that because we all know the 102A creativity standard is very, very low. And I would point out another thing. This question of 7,000 lines of code, the case that was tried in the district court was only about the SSO. They made a tactical decision, Oracle did, not to ask the jury about literal copying of these so-called 7,000 lines of code. What they asked the jury was only whether or not Google infringed the overall SSO structure, sequence, and organization of the copyrighted works. That was the only question the jury got on this issue. That's the formulation that Oracle sought. They didn't object to that going to the jury. And they repeatedly told the judge and the jury they weren't complaining about literal copying of the names, declarations, and phrases. For example... Did they tell the jury that they weren't complaining about literal copying of the 7,000 lines that made up the outline? What they said was an individual name is not protectable, but the names as part of the structure, sequence, and organization are protectable. That's what they said. Doesn't that preserve the... Oh, I'm not arguing waiver. I'm saying that this idea that somehow there's a different thing we're talking about here because of 7,000 lines of code, that it's only one thing we're talking about. We're only talking about the structure, sequence, and organization of Android and of Java. That's the only issue that was presented. That instruction, though, consistent with a basic idea, which I thought the trial court may not have grasped fully. You can't deconstruct a document and pick out one word or one phrase and say, oh, that's not copyrightable because it's a word or a phrase. It seemed to me the trial court spent time on the word and phrase exception by deconstructing the program, and that isn't really the issue. I think the issue is the one that they posed, which is the total structure of Java, not a particular word or phrase. Do I misunderstand that? I don't think you do, Your Honor, except for this. It's true that Judge Yeltsin talked about the short phrases and declarations exception, but his ruling really is not based on that. His ruling is based on looking at the overall structure, sequence, and organization and saying that there was an expectation out there among developers that you had to use it. Why wasn't the expectation standard? I mean, back to Judge Taranto's point, you're supposed to make the determination of copyrightability at the time that the creative act occurs, correct? Does copyrightability get lost because it becomes popular? I mean, it's tucked in, no longer copyrightable as, you know, stuff not copyrightable anymore because people like it? I think in Lotus, the fact was that, of course, the Lotus 1-2-3 spreadsheet didn't exist at the beginning of time, and they evaluated copyrightability there as of the date of infringement. So in Lotus, clearly, they looked at what was happening at the date Borland was accused to infringe, and they found that, yeah, there's an expectation out there. Is that the correct point in time? I think so. That's the copyrightability, not fair use, but that's the copyrightability. I think it is. It clearly is under Ninth Circuit law and our First Circuit law that they're looking at that question both at the inception, when it's clearly a method of operation, and they're looking at it at the time of alleged infringement. That's clearly true under Ninth Circuit law. Because that's what happened in Sagan. But for fair use, obviously. For fair use, obviously. For fair use, obviously, you have to look at when the use occurs. But for copyrightability and determining whether something is expression or whether the claim of protection extends to something else? Both of those cases talk about expectations and industry standards as part of what goes into this 102B analysis, not just fair use. They both talk about the fact that if there's an expectation or an industry standard or a commonly understood way of doing something. And here, what was very clear to Judge Elsup was that for years, people had been using Apache and these other programs using the same structure that's in Java, the same SSO, without any complaint whatsoever from Sun. And that was part of why that expectation was developed. The CEO of Sun testified that these were made available to people so they would buy more Sun products and they were out there as a tool to access the programs. They were never something that Sun expected to earn money on or any of that. And they made a conscious effort to get them out there to universities and everywhere else so they could be used. I'm going to want you to turn to fair use in a minute. And when we do that, you can say Sega and Sony all you want. But I just want to go back to something you said in response to Judge Plager's question. Do I understand that what you're saying is that you concede that to the extent that the trial judge focused on the short phrases doctrine, that that probably wasn't the best part of the trial court's analysis? What I concede, Your Honor, is it's not necessary to the conclusion they reached. And they effectively conceded it, too, because they told the jury you can't copyright a name or a phrase. And let's face it, this quote declaring code, all it is is a series of names. That's all it is. I know they told the jury you can't copyright a name or a phrase. We all know you can't do that. But the question is, in this context, was the court's emphasis on the short phrases doctrine sort of out of place? I don't think it was out of place. But it wasn't necessary to the ultimate result. That's what I would say, Your Honor, is that he didn't have to. It was not really an issue. Yeah, at the end of the day, that's right. So what he said about it is irrelevant. It's not necessary. It's irrelevant to the result they got, Your Honor. That's right. Because his result was not based on that. His result was based on 102B, Baker v. Selden, and the idea that if 102B says methods of this SSO was such a thing. That's what he concluded after all the testimony. You have five minutes on fair use. Let me just double check. You don't dispute the applicability of the Copyright Act to computer programs? No, no, no, no. Obviously. And as you begin on fair use, what's the case that says, which I think is not disputed, but I don't have the case in mind, that says the bottom line question of fair use is a reviewed on appeal like any other fact question. I'm not sure which case holds that, Your Honor. But I think there are a number of them. And obviously, as we've been talking about, SEGA and Sony and other cases also are fair use cases. In this case, both parties agreed that should be submitted to the jury. The factors to say there were no disputed facts. As you know, because you do patent work, a lot of questions that are ultimately legal questions on their bottom line get submitted to the jury. And what I'm trying to figure out is the usual standard of review question. Because if there are genuinely no underlying fact questions, what happened, who did what, when, what dollars are involved, et cetera, to be determined, then maybe all that's left is a legal evaluation of those facts. In which case, the question would be, why remand? I don't think that we're in that position. Because as we know, there are four factors that apply to fair use. They were all contested. And if I can have just a moment or two on that, the purpose and character of use goes to whether or not you're transformative. In many of these cases, mere commercial use doesn't mean it's not fair use. Obviously, Lotus and the rest of them were all commercial use cases. But the jury was presented with a ton of evidence that Android was transformative. No one had used Java to build a smartphone. It opened up a whole new area of development. Okay, so what are the material issues of fact? Let's just focus on that. The material issues of fact on fair use are, one, what is the purpose and character of the use? Was Android transformative or not? And was Android something that was new, that existed, that transformed the use of Java, or was it not? And the question there was... But where are the disputes of fact? I mean, you say, was it transformative, but not the ultimate question of whether it's transformative is one thing. But what facts relating to that were in dispute? The facts that were in dispute were, how was Android used? What did Android do? And was Oracle in a position to have created any sort of smartphone product using Java? Had anyone done it? We called several witnesses from Oracle to say they weren't able to do it. They tried to do it. No one was able to do it. Excuse me? Do what? Do what? Use Java to create a smartphone platform like Android. In other words, Java language was used in computers and in laptops, but had never been used in a smartphone before. And there was a lot of evidence back and forth about what Android was, and how broadly it was used, and what products it was used in. And that's a material question fact that a jury has to resolve. And they didn't resolve it. And as to the amount used, that's another one of the factors. The amount... How was that in dispute? That's... Well, the question is, was it de minimis? Was it a lot? Was it a little? How much of Java was used in Android? If you say there's no de minimis exception, then that issue goes away, doesn't it? I don't think so, Your Honor. Not for fair use. The fair use question is how much of the plaintiff's copyrighted work was used. And that's a question that's closely related to infringement and substantial... We know exactly how much it was, right? But compared to what? I mean, the question is, are we going to compare it to just the 37 packages? Are we going to compare it to Java as a whole, the work as a whole? This boils into the cross appeal. That's a jury question of whether what was used was substantial or not. The effect on the market. The effect on the market is another issue that was disputed. The effect on the market... They were arguing, well, we've got a licensing program. And our licensing program lost money. That was disputed, whether they'd lost a penny in the licensing. They said, well, we could have launched a smartphone. That was disputed because the evidence was that they looked at launching a smartphone and decided they couldn't do it. They didn't have the technical capability. So our point on effect on the market was we expanded the market, not only for other developers, but for Java developers and for Java itself. And their argument was, no, you took away our ability to enter the market. That was a hotly disputed question of fact on which engineers and business people from both companies were called and testified. And that has got to be tried to a jury. It's a question of fact. It hasn't yet been resolved. And so I would say purpose and character of use, transformation, amount used, effect on market. Those are three of the four categories. The fourth category... Purpose and character, though. You don't dispute that it was entirely a commercial purpose. No, no, no. But again, that doesn't decide the fair use question. A question that we... It's a factor. It's a factor. It's a factor. You look at, was it transformative? Was it just a copy that was where you're trading on their name? Obviously, Android was a lot more than that. Didn't use the Java name. Had 15 million lines of independently developed code. And our whole point was this is transformed and created a whole new market that no one else was able to create before. Now, they are disputing that and they did dispute it in the jury trial. And as you know, the jury did not reach a result. You have about 30 seconds to wrap up. I know you've been up here as long as you normally are for closing arguments. Thank you, Your Honor. I would say this. The questions of infringement and fair use are intertwined. Those questions are closely related. Fair use means there's no infringement. And because you're looking at things like the amount used, the nature of the use, and the like, if this case goes back, those issues should be left to the district court to figure out what a retrial looks like. Our view is the district court got the law right. He followed the Atari case. He followed the Sega, Sony, and Lotus cases. He applied that to the facts that he found after a two-week trial in which he heard 26 witnesses and looked thoroughly at Java upside and down. He got the law right. He got the facts right. He properly applied Ninth Circuit law to find that there's no copyright ability in this structure, sequence, and organization, and that Google used only what they had to use to accomplish that legitimate goal, not any one of the millions of lines of code in Java. Okay. Thank you. That was a long 30 seconds. Mr. Rosengrant, I'm sure you have a lot that you want to say, but let me preempt it just for a moment. Yes, Your Honor. When all else fails, I've been known to read the statute. And when I look at 102B, it's a peculiarly written statute, which is not unique work by our Congress. But here's, do you have 102B handy? Yes, Your Honor. It basically says, copyright does not, quote, extend to any idea, skipping over, concept, principle. We'll leave out discovery because that doesn't make any sense at all. Any idea, concept, or principle. Well, that's pretty clear as a demarcation concept for what I've always understood poorly, perhaps, of what copyright is about. But then they put in the middle of those phrases the following. Procedure, process, system, method of operation. Those words must have some meaning other than idea, concept, or principle. So why doesn't Java fall under one of those labels as a procedure, a process, a system, or a method of operation, regardless of this creative versus functional? I mean, doesn't the whole thing get swept up into 102B? So, Your Honor, if, as Mr. Van Ness says, 102B is a series of exceptions to 102A, then just to start reading the statute the way you did, that means expression is protected under 102A, but it's taken away, the protection is taken away, if it also expresses an idea. That's clearly not the way the statute is. No, no, no. That's the, that's. It also is taken away if it expresses an idea. So then you ask, okay, so what is, how is method of operation different from an idea? It's yet another abstraction from the expression. You can refer in Baker v. Selden to the idea of dual entry accounting, or you can call the dual entry accounting a method of operation. Baker v. Selden calls it both things, and it distinguishes that from what it refers to as method of statement, which was the expression of the author. But I'd like to, if I may, just turn to fair use, which consumed a lot of the Court's time. And just to correct one thing that I may have misstated, the question of fair use is a mixed question of law and fact. Harper versus, Harper and Roe says that. So it's a mixed question of law and fact. So it is reviewed de novo. It is reviewed de novo. Now, obviously. I was wondering if somebody was going to get to Harper. I was dying to get to Harper, too. It's a very powerful case, both on, well, certainly on fair use. And so it is reviewed de novo. Subsidiary factual questions might be relegated to the jury, but how you weigh it all is a legal question. I will emphasize, though, that Google's brief says nothing at all about subsidiary factual questions in responding to fair use. It is all about how courts should be applying the fair use factors. The question whether something is transformative is a legal question. There's no dispute about Android being used in competing products. There's no dispute that it's being used for the same purpose. We're arguing about whether the fact that they did it for smartphones, when we were already selling to every major smartphone manufacturer, whether that's transformative. But that's not what transformative means. Transformative means that you have completely changed the character of the use. Even if we were to accept that on that topic, it's arguable that what's left is a legal conclusion. There was a lot of conflicting testimony about effect on the market. There was a lot of conflicting testimony about the amount of the use in connection with the overall structure of Java as a whole. So why shouldn't we allow the jury to assess that question? Well, Your Honor, so first I'd say the factual disputes really bear no relation to the big picture, how you analyze the fair use factors. So for example, effect in the marketplace. There's no dispute that under the law, or I should say it is clear that under the law, even taking someone else's prospective opportunity, and there is no question that Oracle was poised to be the big player in smartphones if its product had not been taken by Android, incorporated, and replaced it in the marketplace. There is no dispute at all about that. That alone is enormous market effect. There's no dispute, for example, that there were products in which, for example, Kindle, in which Java was used, and then it was replaced by Android in the Kindle Fire. It's the same exact use of this code, but you put to a slightly different market. But in fact, it's the same players in the marketplace. Can I just, I mean, I'm not sure that this is dispositive in any way, but because we don't have a jury verdict on this question, we can't do what we normally do when looking at a mixed question of fact and law that depend on underlying facts, which is to assume, because we have no other choice, that the jury resolved all the facts in favor of whatever supports that bottom line. So the question, I think, on this remand, assuming that we get to it, get to fair use, is whether there really are any underlying facts as to which you could decide it either way, and I don't mean kind of ultimate value-laden characterizations, but any actual underlying facts in which the evidence could produce a finding one way or another where that finding could then affect the ultimate conclusion. Well, Your Honor, let me answer it in this way. I mean, my answer is no, there aren't, because the factors weigh so heavily when you put them together in our favor. But if the court has any doubt about that, I would urge the court not to just send it back and let the district court figure it out, but to send it back with very clear directions on how you, for example, analyze transformative use and how you analyze market substitution, the effect on the market, because those are things that the district court just plain misunderstood here. And Google's entire position... You're saying that the jury instructions were wrong? You didn't appeal from... We did not appeal from the jury... My answer is yes, the jury instructions actually were wrong. We didn't appeal on that, because there was a lot of other material in this case. But the district court now going forward, if the court remands to the district court, it should analyze transformative use and say, here's what it is. It has to be a completely different character. You can't count the fact that it was extended into a new generation of smartphones. We were in smartphones. And the fact that we lost the opportunity to of Oracle's president, you can't compete with free. That counts very heavily in our favor for transformative use. I'm sorry, just go ahead. On fair use, what's your very short distinction between this case on fair use and Lotus? Thought of, if you think of Lotus as a fair use case, the way half of Judge Boudin's opinion did. So, from a fair use perspective, I think the court was wrong. But from a fair use perspective, what the court did in Lotus, at least half of Judge Boudin's opinion, was to say, look, Borland actually came up with its own SSO, so to speak, its own command structure, really did the for those who had already written macros for that first platform so they could use their macros. And because Lotus was never going to be replaced by Borland's platform, unless Borland really was superior in SSO, that counted very minimally for fair use. But I think, frankly, I think it was wrong on fair use as well. Okay. I think we're done. Thank you, Your Honor. I'm used to being a district court judge. I got to get these guys under control. All right. We're going to turn to the cross appeal. So, we'll get to start with you, Mr. Van Hassen. Thank you, Your Honor. May it please the court, I will be very brief. I've reserved three of my 10 minutes for rebuttal. Perhaps I won't need those. Key points on the cross appeal. There is a de minimis exception to copyright infringement in the Ninth Circuit, even when copying is admitted. The holding of Newton was, quote, even where the fact of copying is conceded, there is no legal consequence from it, unless the copying was substantial, unquote. The Newton case is good law in the Ninth Circuit. It's not in conflict with Norse, which was decided earlier. Even if we agree that there's a de minimis exception, which I know that's debated, but even if we agree with that, is it de minimis in relation to what? So, are we supposed to say that this, for instance, this range check, which has its own function, is de minimis vis-a-vis the 166 packages, or is it vis-a-vis the 34 packages, or is it vis-a-vis only the things that perform the range check function? I think it could be all of those. We argued that the trial judge didn't give us the right instruction because he didn't require the jury to compare range check to the work as a whole, but the judge properly said to the jury, you have to look at it as a whole. So, let's just take range check first, where the jury found against this, and we argued for Jamal. So, shouldn't we assume that they made a qualitative determination? But was there evidence to support it because of the following? On the quantitative side, pretty clear, nine lines of code, whatever measure you use, that is de minimis against the rest of it, right? Because there are something like 3,000 lines of code just in the little tiny file range check is in, and there are thousands of lines of code, hundreds of thousands, in the 37 Java packages, and there are millions of lines of code in Java. So, qualitatively, there was no evidence other than it was de minimis quantitatively. Qualitatively, Judge Elsup found, after this two-week trial, that the range check function was, quote, inconsequential, that it was innocuous. The testimony was that this was, these nine lines of code were very simple comparing one range to another. They could have been written by a high school programmer, that was the evidence, and the only evidence they cite to is testimony from their expert that the range check function within arrays.java was called by the program 2,600 times. And our point is, that is meaningless unless there's context. Obviously, these systems are performing millions of operations a second, and the fact that a range check function is called 2,600 times, if you're not comparing that to some other function or putting it in context, can't possibly support... Didn't he say 2,600 times just when it's powering on? He said 2,600 times during some operation of a program. He took some period of time and said 2,600. But again, millions of operations are performed in power on and power off, and he provided no context, and that's the only evidence they cited in their brief to support the verdict. Whereas, the trial judge said, inconsequential, innocuous, very simple, could have been done by a high school programmer, that can't possibly overcome the de minimis requirement. And again, I think... Can you say what's the relevance of the high school programmer? The relevance is, if you're looking at a qualitative de minimis, you look at how significant is this, how difficult was it to do, how important is it, where's the fit of the scheme of things, and what... But you're not arguing it wasn't fair. No. I mean, here we're talking about... I guess I was thinking, I mean, does it... I was trying to translate that into something that was other than a gut level intuitive appeal. So I was thinking, is it something like the following? Simple function, there are only so many ways you can write program for this function. They used Oracle's expression of that. They could just as easily have used, created their own expression to do the same thing. Completely insignificant difference between the feeling of the expression and performing the function some other way. Yes, your honor. All of the above and so simple, almost anybody with any programming ability to do it. That was the point of it. High school programmer may have been an inapt phrase for somebody who's incompetent to do programming. Appellate judges might have been better. Right. Judge Yeltsin disclosed to his latent trial that he actually was a programmer. And so he was in a position, I think, to evaluate this. So on range check, I would say two things. The JMOL was wrong because there wasn't evidence to support the verdict at all. And because we didn't get the benefit of comparing range check to the work as a whole. From a qualitative standpoint, though, you don't dispute that you've copied these literally, right? No, that's right. I mean, the testimony was- Why bother to copy them if they weren't important? Because what the circumstance was that Josh Block, the author of these, had been at Sun. He came to Google. He wrote a new program. He was intending to devote this whole thing back to Java, the community. And in the course of doing that, inadvertently left in this piece that didn't really need and wasn't really significant, could have rewritten it anyway. And that's why the judge said it's inconsequential. What impact is this on the appeal as a whole? If the case goes back, if the case goes back, they made a big deal in the trial about all the stuff we copied and the nine lines of code- Finish your phrase, if the case goes back what? If the case goes back, this issue shouldn't be tried to the jury. It was resolved and- It should be tried to the jury. Should not be. There's not enough evidence to support a verdict other than this is de minimis use. That's your point. What are the stakes? What are the stakes? There's no damages. The stakes of it are, they made a huge deal of it in the trial court. There's no damages that flow from it. They stipulated to that, but it shouldn't be a part of any retrial. No damages of any sort. Right. Okay. And this is, or this has been removed from Android. Is that right? It has. Right. It's been removed before the trial began. It was removed before the case was filed. Why do we have an issue here about this? Because they're asserting it. There's no relief that actually turns on it. They're asserting it as part of their copyright infringement case, and they want to argue to the jury that this was literal copying. No, no. I guess I'm asking what is, I guess I would say is an article three question. They're not entitled, are they? And if so- They'll argue, they'll argue to prove it as part of an injunction. I mean, who knows what they'll argue, your honor, but they made a big deal of it, and they paraded it around the court. I don't know what they'll argue, but- Yeah. Your time's up. We don't want to use up your rebuttal. Okay. Thank you. Okay. I've got, there's two other arguments here that are waiting behind you guys, so. Understood, your honor. We'll take a lunch break at the- Yeah. And I'm not giving you any extra time either because I've held him- Understood. I just have a few points to make. Let's just assume that there is a de minimis exception for present circumstances, at least for argument's sake. We'll rest on the briefs with respect to that. We prevail as long as there was a qualitative significance to these two sets of programs. And it was more than de minimis. The jury was right as to range check, and the district court was right as to the eight security files. Google concedes that we prevail even if it's qualitatively different. There was certainly testimony supporting the proposition that when you use a program 2,600 times upon startup, that's qualitatively significant. As to the eight security files, Dr. Mitchell testified at $21,500. Well, there's testimony, but there's also testimony to the contrary. I mean, the jury doesn't have to believe your testimony. Actually not, your honor. That's what the district court found. So Dr. Mitchell testified about the qualitative importance of the eight security files at $21,501-02, and the district court said that Google said nothing in response. Now, let me respond to Judge Allison. Does the innocence factor, I mean, the fact that this was a mistake, does that go to fair use? It doesn't. Well, we're now talking not about fair use because there's no fair use defense here. We're talking about de minimis. The motive has no bearing on the qualitative importance for if there is a de minimis exception. And so let me talk about Judge Alsop's point that we've overblown. His point was that it's inconsequential. Now, the it in that sentence, recall, Judge Alsop believed that we satisfied the burden for being more than de minimis. The it was the motives, to your honor's question, not the significance. He found that it was significant and as a matter of law. And as to the high school programmer, the point that Judge Alsop, the point of the testimony was, as Judge Alsop understood, if we tell them what to do, a high school programmer could do it. If there are no further- How do you distinguish Newton, though? I mean, clearly the Ninth Circuit said there, at least it seems to have said that there is a de minimis exception. Well, yes, your honor. So let me just premise my answer by pointing out it doesn't matter whether we're right or wrong and whether there is a de minimis exception, if we've satisfied it as a matter of law or if we've satisfied it as a matter of fact for one of these upper points. And quantitatively, what are we comparing this to? I mean, you make an argument that we should be looking at Java's program as a whole when we assess its copyright ability. Why shouldn't we be comparing it to the entirety of the 166 ACF? Let me, if I may answer the first question first and then the second question. So there is a way to distinguish Newton and we do it in our brief, but the most important point this is to make is that Newton was after the Ninth Circuit already concluded that there is no de minimis exception. Newton came later and under Ninth Circuit law, the earlier panel controls. It didn't even acknowledge the existence of that earlier panel. To answer your honor's question about what you compare it to, what you compare it to for copyright or overall fair use purposes may well be, I would say, at least the 166 or 168 packages. But when you're talking about a de minimis exception, you can compare it as the Ninth Circuit did in Hustler to the subset of the work that can quote, stand totally alone. And these files, certainly the eight security files did stand alone. They weren't even part of the 168 packages. And the consequences of concluding otherwise are really profound. It means that in a program that has, if Google is right, 15 million lines of code, we are freeing people to copy entire programs just because the denominator is so big. And that's simply not the world that the de minimis exception, if it does exist, is designed to encourage. So why is this relevant to the retrial? If there were to be a retrial, is this just something that you want to use to taint the jury? No, your honor. To be clear, the stipulation was, we stipulated to no damages conditionally in order to get the case up to this court for appeal. But the stipulation was explicit that if there is a remand and there is a retrial on damages, this will be part of the damages calculation. Both experts included these files as part of their overall damages calculation. We don't have a final judgment here? We do indeed have a final judgment, your honor. There's nothing further for the district court to do. It's no different from, I know this court doesn't do a lot of criminal cases, but a conditional plea premised on, you know, winning on the suppression motion. And that's, you know, obviously, the court would have jurisdiction under article three. If there are no further questions, we respectfully request that the court reverse on the first, on the main appeal and affirm the district court on this appeal. Thank you, your honor. Very briefly, thank you, your honor. I did want to correct my answer to Judge Toronto's question. Counsel did. I guess there's a damage claim still an issue and that's what's happening. I didn't get a chance to talk briefly about the eight test files where the jury found the minimus and Judge Alsop reversed that. All we need to show is that there was substantial evidence to support that. And the evidence was overwhelming that those eight test files were both qualitatively and quantitatively de minimis. They were, there was no showing they were ever placed onto a smartphone. There was no showing they ever did anything or were ever used to test anything. They existed in the Android platform, but there was no testimony that they had ever been used to do anything. And on the... It's whether it's something de minimis, a factual conclusion? Absolutely. And the other part of it on the quantitative part, it's the same point I made before. If you compare these eight test files to the 15 million lines of code in the Android, they are truly de minimis and there was really no evidence to the contrary. So with respect to the eight test files and the range check, neither one should be placed before the jury. But again, we appreciate the court's time and attention this morning. We ask that the judgment below be affirmed. Thank you.